In the
**UNITED STATES DISTRICT COURT**
for the **SOUTHERN DISTRICT OF INDIANA**,
INDIANAPOLIS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| *vs*. ) | CAUSE NO. 1:08-cv-1415-SEB-TAB |
| ) | |
| **JAMES L. COOKE, JR.; DOUGLAS P.** ) | |
| **LIVELSBERGER**, and **MARK A.** ) | |
| **RATLIFF**, ) | |
| ) | |
| Defendants. ) | |

## E N T R Y

**Plaintiff's Motion for Summary Judgment Against Mark A. Ratliff (doc. 43)**

This is a civil action by the United States to collect on assessments that the Secretary of the Treasury made against the three defendants for failing to remit to the United States federal employment taxes that were withheld from the wages of employees of Downtown Collision, LLC, an auto-body repair shop in which the defendants were involved in management and/or ownership capacities. A default judgment was entered against defendant James L. Cooke (doc. 41) and a consent judgment was entered against defendant Douglas P. Livelsberger (doc. 35). Defendant Mark A. Ratliff admits liability for some of the assessments made against him and contests the others. The United States now moves for summary judgment on the contested assessments. Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

1

56(c)(2).

Pursuant to 26 U.S.C. §§ 3102(a) and 3402(a), employers are required to deduct and withhold income and social security taxes from wages paid to employees. Pursuant to 26 U.S.C. § 3111, employers are also required to pay their own contributions to the social security system. Taxes withheld by an employer are held in trust for the exclusive benefit of the United States and may not be used for the business's purposes. The amount of withheld taxes must be reported on employers' Quarterly Federal Tax Returns and remitted quarterly.

26 U.S.C. § 6672(a) provides that any person who is responsible for collecting, truthfully accounting for, or paying over any tax imposed under the Internal Revenue Code and willfully fails to do so or attempts to evade or defeat any such tax or the payment thereof shall be liable for a penalty equal to the total amount of the tax evaded, not collected, or not accounted for and paid over. Thus, a person must be both "responsible" and "willful" in order to be liable for the 100% penalty. "An individual is considered 'responsible' if 'he retains sufficient control of corporate finances that he can allocate corporate funds to pay the corporation's other debts in preference to the corporation's withholding tax obligations.'" *Jefferson v. United States*, 546 F.3d 477, 480 (7th Cir. 2008) (quoting *Bowlen v. United States*, 956 F.2d 723, 728 (7th Cir. 1992)). *Thomas v. United States*, 41 F.3d 1109, 1113 (7th Cir. 1994).

A responsible person need not have exclusive control of the employer's finances (there may be several responsible persons for one incident) or the final-decision authority over which debts to pay; he need only have significant control over the decision-making process by which the employer allocates funds to other creditors in preference to its withholding tax obligations.

*Thomas*, 41 F.3d at 1113; *Bowlen*, 956 F.2d at 728.

> The concept of responsibility in this context does not focus on whether a particular taxpayer could himself have paid the taxes; rather, it focuses on whether the taxpayer could have impeded the flow of business to the extent necessary to prevent the corporation from squandering the taxes it withheld from its employees.

*Thomas*, 41 F.3d at 1113.[1] *Bowlen*, 956 F.2d at 728 ("In effect, responsibility under section 6672 encompasses all those connected closely enough with the business to prevent the default from occuring"); *United States v. Laketek*, No. 06-C-5140, 2007 WL 4354998, *5 (N.D. Ill., Dec. 10, 2007).[2] A person could sufficiently impede the flow of business by, for example, refusing to sign checks, refusing to allow payroll to proceed, and refusing to pay other creditors until delinquent withholding taxes are remitted. *See Thomas*, 41 F.3d at 1114; *Bowlen*, 956 F.2d at 729 (person's ability to veto and affirm payments to creditors rendered him a responsible person (citing *Purdy Co. v. United States*, 814 F.2d 1183, 1187-88 (7th Cir. 1987)). While having check-writing ability for an employer in financial difficulty alone does not make a person liable for the employer's failure to pay withholding taxes, *Jefferson*, 546 F.3d at 480-81, the person risks liability if he is aware of recent past delinquencies by the employer and the employer's current financial difficulties, yet fails to inquire about the status of the employer's withholding taxes before signing checks or fails to institute financial controls to guard against further delinquencies. *Wright*, 809 F.2d at 428.

---

[1] *Thomas* later described the action as "imped[ing] the functioning of" the employer. 41 F.3d at 1114.

[2] "As already stated, Section 6672 does not require that the 'responsible person' be affirmatively able to pay its tax obligations (see *Thomas*, 41 F.3d at 1113). Instead, the mere ability to 'impede[] the functioning" of a company until its tax obligations have been met can be enough to qualify someone as a 'responsible person.'" *Laketek*, 2007 WL 4354998, *4.

A person cannot avoid responsible-person status by claiming that he was only following the orders of superiors or feared being fired. *Thomas*, 41 F.3d at 111516. Therefore, § 6672 "casts a broad net of liability," *Bowlen*, 956 F.2d at 728, encompassing not just final decision makers or the *most* responsible persons, *Wright v. United States*, 809 F.2d 425, 427 (7th Cir. 1987).

Several indicia of responsibility have been identified in the decisions, including having an ownership share in the employer, having authority to sign checks or prevent their issuance by withholding signature, *Bowlens*, 956 F.2d at 728, and holding a corporate office, *Thomas*, 41 F.3d at 1114.

Once the United States introduces evidence that it has made an assessment against an individual, a presumption of correctness attaches thereto, which shifts the burden of production and persuasion to the assessed individual to prove that the assessment is erroneous. *Pittman v. C.I.R.*, 100 F.3d 1308, 1313 (7th Cir. 1996); *Hefti v. Internal Revenue Service*, 8 F.3d 1169, 1172 (7th Cir. 1993). Proof that a Certificates of Assessment was made is sufficient to show an assessment, invoke the presumption, and shift the burden to the taxpayer. *Id*.

The following summary of the facts underlying the case before us is drawn from the undisputed statements of material facts submitted by the parties; disputed facts will be noted. Downtown Collision was the last of three auto-body repair shops formed by defendant Douglas Livelsberger. All three entities had histories of financial and other problems due to Mr. Livelsberger's mismanagement and his use of business revenues for personal purposes. Mr. Ratliff, a certified public accountant with experience as a controller for small businesses, had

4

performed accounting services as an independent contractor for the predecessor of Downtown Collision. He was recommended by the lawyer who handled the bankruptcy of the first of the three auto-body entities. In late 2002 and 2003, Downtown Collision's predecessor owed withholding taxes reaching well into six figures, faced eviction, and owed substantive sums to creditors, including the parents of Mr. Livelsberger. Looking for a way to get his loans repaid and to preserve his "sweat-equity" in the business's building, the senior Livelsberger, together with his son, asked Mr. Ratliff to work for Downtown Collision, the third auto-body business that was being formed as the successor to the failing second entity. It was intended that Mr. Ratliff handle the financial end of the business while Mr. Livelsberger handled the body shop end. Mr. Ratliff was to "babysit" Mr. Livelsberger and control his penchant for excessive expenditures in addition to generally correct the financial mismanagement problems that had plagued the previous entities. Mr. Ratliff agreed and began working at Downtown Collision in January 2003. He was given the title of Manager, but he functioned as company controller. His business card listed him as C.F.O./C.P.A. Mr. Ratliff worked at Downtown Collision from January 2003 through December 2004, when he left the company.

Mr. Ratliff was told, when he started, that he would be given a 10% ownership share in the company, and he would share 10% of the profits and losses. Mr. Ratliff asserts that he never saw any evidence that he was actually officially ever given such a share in the company and was uncertain whether he was, in fact, an owner. Mr Ratliff asserts that, while he filed company federal tax reports claiming an ownership share and assigning himself a 10% portion of the company's losses, he did not claim or report the losses on his personal taxes because of his uncertainty regarding whether he was an owner.

Throughout his time at the company, Mr. Ratliff maintained its financial books and records, prepared the company's quarterly federal tax returns, had check-signing authority, stored the company's checkbook in his desk, and signed the majority of company checks during the assessed delinquent periods. Both Mr. Livelsberger and, later, Mr. Cooke, also signed company checks and a few checks were signed by others. Mr. Ratliff concedes that, at least until Mr. Cooke started work at the company in August 2003, he handled the financial aspects of the company.

Mr. Ratliff alleges that, because of Mr. Livelsberger's past tax problems, it was decided by Mr. Livelsberger and his father that Mr. Livelsberger would have no official role with Downtown Collision. Rather, all ownership interests were to be held by the senior Livelsberger, except for Mr. Ratliff's 10% share and another share owned by an investor.[3] According to Mr. Ratliff, "[i]t was understood" that, despite these representations, Mr. Livelsberger was the "real owner" of Downtown Collision. In addition, while Mr. Ratliff was officially designated as the manager, again "it was understood" that Mr. Livelsberger was to exercise most of the powers of a manager while Mr. Ratliff's role was limited to controlling Mr. Livelsberger's improvident spending and free him to operate the body shop without worrying about the financial end of the business.

Downtown Collision continued to experience financial difficulties similar to those

---

[3] The unexecuted Operating Agreement indicate ownership shares in the amounts of 77% for the senior Livelsberger, 13% for the investor, and 10% for Mr. Ratliff, based on capital contributions of $54,000 from the senior Livelsberger, $13,000 from the investor, and $10,000 from Mr. Ratliff. First Amended Operating Agreement of Downtown Collision, LLC, Government Exhibit 20 (doc. 66-1), §§ 8.01 and 9.03.

experienced by the earlier entities. Mr. Ratliff alleges that he attempted, but failed, to control Mr. Livelsberger's spending. Though Mr. Ratliff refused to make payments relating to Mr. Livelsberger's personal expenses, because Mr. Livelsberger was also a signatory on the company checking accounts, he would withdraw the money himself and not inform Mr. Ratliff. When revenues increasingly failed to cover both current expenses and the predecessor entity's debts, Mr. Ratliff sought Mr. Livelsberger's direction on how to prioritize payments out of the insufficient amount of available cash. Mr. Livelsberger directed that priority be given to expenses that kept the doors open and suppliers delivering parts. He did not give priority to paying withholding taxes. Mr. Ratliff followed this direction.

By August 2003, the financial situation was dire. Defendant James L. Cooke, Jr. joined the company at that time as a financial savior. He brought with him not only operating cash to lend to the business but also a truck-rental customer that would generate significant business. Mr. Ratliff signed Mr. Cooke's employment agreement as "President" of Downtown Collision, but Mr. Ratliff disputes that he was ever denoted or functioned as a President. In order to accommodate an ownership interest given to Mr. Cooke, Mr. Ratliff was told that his share had to be reduced from 10% to 6%. It was decided that Mr. Livelsberger would be President and Chief Executive Officer, Mr. Cooke would be Chief Operating Officer, and Mr. Ratliff would be Chief Financial Officer.

Mr. Ratliff alleges that his control over the company's finances diminished as Mr. Cooke's increased. Before Mr. Cooke's arrival, Mr. Ratliff would meet with Mr. Livelsberger to prioritize the weekly list of obligations, including the payroll tax obligations, that Mr. Ratliff

compiled. After Mr. Cooke's arrival, Mr. Ratliff still compiled the weekly lists but now met with both Mr. Livelsberger and Mr. Cooke. Mr. Cooke insisted that available funds be used first to repay his and the senior Livelsberger's loans to the company and to pay his critical vendors (vendors supplying parts for work on Mr. Cooke's clients). Mr. Ratliff alleges that, when business improved and additional revenues began coming in, he told Mr. Cooke that he intended to use some funds to pay payroll taxes, but Mr. Cooke insisted that his loans and other amounts due him be paid first, then payments be made to critical vendors, wages, and other expenses to keep the doors open before any money was paid toward tax obligations. When Mr. Ratliff complained to the senior Livelsberger about this, Mr. Ratliff alleges that the senior Livelsberger told him that Mr. Cooke was running the company and that Mr. Ratliff needed to do whatever Mr. Cooke directed. Mr. Ratliff alleges that he realized from this conversation that the senior Livelsberger had withdrawn the authority originally delegated to him, that his role had been reduced to a mere bookkeeper, and that the title of chief financial officer was, in fact, meaningless.

The parties dispute the status of Mr. Ratliff's functions and authority thereafter. Mr. Ratliff alleges that his responsibilities were limited to answering the telephone, picking up parts, dealing with insurance companies on claims, and posting accounting entries. He continued to write and sign checks, but only as Mr. Cooke directed. He prepared payroll tax returns, but did not sign them because he did not believe he had the authority. He also continued to compile the weekly list of bills, which always included the payroll tax obligations, but he no longer had the authority to determine which bills to pay. In response, the United States points to Mr. Livelsberger's testimony that Mr. Ratliff continued to handle the company's financial affairs

8

after Mr. Cooke arrived and that his duties did not change until he left the company. He testified that Mr. Ratliff continued to sign the bulk of the company's checks and paid bills without seeking anyone's input. Mr. Livelsberger also testified that Mr. Ratliff controlled all deposits, creditor payments, and payroll; negotiated insurance policies; prepared tax forms; negotiated the lease; had physical possession of the checkbooks; opened the mail; input all the invoices; negotiated with creditors and prioritized the bills to be paid. Mr. Cooke testified that, after he arrived at the company, Mr. Ratliff opened the mail, paid the bills, handled telephone calls from creditors, maintained receivables records, maintained custody and control of the checkbook, maintained the company bank accounts, prepared the company's tax returns and reports, and continued to sign the company's checks. The United States also presented evidence showing that, even after the company adopted a two-signature requirement on company checks (to help control Mr. Livelsberger's access to company funds), Mr. Ratliff continued to issue numerous checks over his single signature, indicating his continued control over the company's finances and his ability to avoid the dual-signature requirement.

The Secretary of the Treasury made five assessments against Mr. Ratliff for unpaid payroll taxes in the amounts of, and for the tax quarters, as follows: $ 4,999.96 (second quarter 2003), $27,591.44 (third quarter 2003), $41,463.24 (fourth quarter 2003), $27,919.64 (second quarter 2004), and $48,035.77 (third quarter 2004).[4] Amended Complaint (doc. 5) ¶ 20.

Mr. Ratliff admits that he was a responsible person under 26 U.S.C. § 6672 before

---

[4] With interest, the assessed balances due as of December 31, 2008 were $5,372.55, $29,502.84, $44,335.60, $29,853.77, and $51.363.44 respectively. Amended Complaint ¶ 20.

August 2003, when Mr. Cooke entered the company. Thus, he admits liability for the second quarter 2003 assessment but contests the remaining four. He did not dispute the United States' argument and evidence that, if he was a responsible person at the time, then he willfully failed to hold in trust and remit the company's withholding taxes. Mr. Ratliff contests only whether he was a responsible person after Mr. Cooke arrived at the company in August 2003 and he contends that he has shown genuine disputes of facts that are material to that question.

As set forth above, Mr. Ratliff argues that he has presented evidence that, when viewed in the light most favorable to him, proves that the powers and authority that he had over Downtown Collision's financial affairs when he joined the company in January 2003 were withdrawn by the senior Livelsberger when Mr. Cooke arrived at the company in August 2003 and the senior Livelsberger told Mr. Ratliff that he should do whatever Mr. Cooke told him to do. Mr. Ratliff claims that he understood that the effect of this was to reduce his role to a mere bookkeeper at the company and that he no longer had control or responsibility of the company's finances. From that point on, he alleges that he took direction on all bill-paying matters from Mr. Cooke and could not control whether the company's payroll taxes were remitted.

The United States relies on the testimony of Mr. Livelsberger and Mr. Cooke to the effect that Mr. Ratliff's role continued unabated and unchanged, that he maintained control and discretion over the company's finances. Ordinarily, these would be differing versions of the facts that a jury would need to sort out. However, Mr. Ratliff's evidence does not demonstrate genuine issues of facts that are material to the question of whether he could have impeded the flow of Downtown Collision's business or its functioning in order to prevent its squandering of

its payroll taxes. There is no dispute that, after Mr. Cooke's entry into the company — and even granting that he gave directions to Mr. Ratliff regarding bill payments — Mr. Ratliff continued to use his authority, position, and discretion in the company to sign and issue the bulk of the company's checks that paid other creditors instead of the United States, while he had clear and complete knowledge that the company was seriously delinquent in remitting its payroll taxes. He also does not dispute that he continued to draw up the weekly lists of bills on which he continued to list other debts in addition to the company's current and delinquent payroll tax obligations. He continued to prepare the payroll, pay the payroll, and prepare the required governmental reports regarding the payroll; he continued to maintain the company's accounting and financial records; and he continued to prepare the company's tax returns.

The caselaw declares that a responsible person may impede the business or functioning of a company by, for example, refusing to sign and issue checks and refusing to allow payroll to go forward unless and until the employer takes care of its tax obligations. *See Thomas*, 41 F.3d at 1114-16. Mr. Ratliff alleges that his authority as finance officer was removed after Mr. Cooke arrived, but he never alleged that he had exclusive, final, and unfettered discretion with regard to the company's finances before Mr. Cooke's arrival,[5] and he did not dispute the evidence showing

---

[5] Mr. Ratliff alleged that, on his joining the company, "it was understood" (presumably among himself, Mr. Livelsberger, and the senior Livelsberger, who held the majority of ownership shares and, apparently, was orchestrating the establishment of Downtown Collision) that, despite the "official" titles and responsibilities, Mr. Livelsberger was the "real owner" and would act as the real manager (the office and title "officially" assigned to Mr. Ratliff). Mr. Ratliff alleges that he sought and took direction from Mr. Livelsberger on what bills to pay, including not paying the company's payroll taxes. While he concedes that he was a responsible person under this pre-Cooke regime, he offered no explanation of how this regime differed materially from the one under Mr. Cooke, from whom he alleges he again took bill-paying directions, as instructed by the senior Livelsberger.

that, after Mr. Cooke arrived, he retained the significant powers and authority over the company's finances described above.  He essentially alleges that Mr. Cooke instructed him regarding what bills to pay and not pay and he obeyed; he did not allege that any of his powers or authority to, *inter alia*, write and sign checks, maintain the books, prepare payroll and taxes, and compile the list of bills were withdrawn and he does not dispute the United States' evidence that he continued to write and issue checks on his signature alone.  In short, Mr. Ratliff has presented no evidence or argument showing that, no matter the specific category of duties he performed, he could not have impeded Downtown Collision's business or functioning by, *e.g.*, refusing to sign or issue any checks; process payroll or the company's taxes; or maintain its accounting, finance, tax, and other records.

     Mr. Ratliff's evidence on his powers tends to show only that he did not have exclusive control over the company's finances in general or the payment of its payroll taxes in particular, and that he did not have the final say or control in paying bills.  But, as explained above, the law recognizes that a responsible person need not have exclusive or final authority in order to be held responsible under § 6672.  The remainder of Mr. Ratliff's evidence and argument tends to show that he was only following orders not to pay the company's payroll taxes and that he feared being fired and/or causing the departure of Mr. Cooke (and his valuable loans and customers) if he paid the taxes.  Again, the law does not permit a person to avoid responsibility status by claiming that he was simply following a superior's orders or feared reprisals.  Mr. Ratliff's evidence simply does not address whether he could have impeded Downtown Collision's business or functioning in order to prevent the squandering of, or misapplication of, its payroll

12

taxes.[6]

     Mr. Ratliff argues only that a person must have the ability to *effectively* impede the non-payment of taxes and *successfully* cause an employer to pay its taxes in order to be held responsible under § 6627. This ability exists, according to Mr. Ratliff, only if the person has, in essence, final control over the employer's finances. In other words, a person's ability to impede an employer's functioning in order to prevent squandering of payroll taxes, and his control over the employer's finances are two sides of one coin. A person's impeding an employer's non-payment of taxes will be effective only if he has "some degree of control" over the employer's decision-making. The Court does not read the caselaw as requiring a person to have the effective ability to impede an employer's business or functioning enough to successfully prevent its non-payment of payroll taxes. Because neither following a superior's orders nor fearing dismissal save a person from responsibility under § 6672, a potentially responsible person risks dismissal for impeding an employer's business or functioning. Because dismissal of the person would presumably end his attempted impediment, successful prevention of non-payment of taxes cannot be the measure of whether a person has the ability to impede the employer's business or functioning and the caselaw demonstrates that § 6672's net captures even "dismissable" persons who do not have exclusive and/or ultimate say over payments.

---

[6] If Mr. Ratliff had the ability to impede Downtown Collision's non-payment of its payroll taxes but, for whatever reason, did not want to take such action, then he could have quit his job in order to shield himself from liability as a matter of law when it became evident that the company would not pay its taxes. *Thomas*, 41 F.3d at 1116. However, Mr. Ratliff chose to continue participating in using the withheld payroll taxes to pay other creditors instead of remitting them to the United States.

13

While there might be a question of the extent to which this principle applies to a person who functions in a purely clerical or ministerial role, yet could cause disruptions and impediments in an employer's business, Mr. Ratliff has not shown a genuine issue about whether he served in such a clerical or ministerial role with Downtown Collision.  As mentioned above, there is no genuine dispute that he, *inter alia*, oversaw the company's finances, maintained its books and bank accounts, maintained possession and custody of its checkbooks, issued checks on only his signature to pay bills, prepared the company's payroll and tax forms, and compiled the list of bills to prioritize.  There is also no dispute that he was told by the other actors that he was an owner, that he reported to the United States that he was an owner, and that the other defendants acted as though, and later testified that, he was a part owner of the company.  Mr. Ratliff did not show that, if he had taken impeding action or inaction and was able to continue to do so unimpeded himself, he could not have succeeded in preventing the company's non-payment of its payroll taxes.

There also is no dispute that, following Mr. Cooke's arrival at Downtown Collision, Mr. Ratliff continued to sign and issue company checks paying creditors other than the United States when he knew that the company's payroll taxes were not being remitted and were being misappropriated by the company for its own purposes.  Therefore, by his direct actions, Mr. Ratliff caused or participated in the company's non-payment of and misappropriation of its payroll taxes.  He did not show that he did anything within his undisputed power and authority to impede the business, functions, or operations of the company in order to prevent the misappropriation or squandering of the monies belonging to the United States.  And he failed to show that he had no ability to cause such impediments or that such impediments that he could

14

have caused, if persisted in, would have been futile.

## Conclusion

Mr. Ratliff has failed to show a genuine issue of fact that is material to his status as a responsible party under 26 U.S.C. § 6672 at Downtown Collision during the period from August 2003 through December 2004 and he has failed to show that the United States is not due judgment as a matter of law. Because he has thus failed to rebut the presumption that he is liable for the assessments made against him by the United States, the United States' motion for summary judgment against him is **GRANTED**. The United States is directed to promptly file final calculations of the amounts owed pursuant to the assessments against Mr. Ratliff, including interest and any other charges in the form of a proposed judgment.

**SO ORDERED.**

Date: 03/31/2011

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Bret S. Clement
AYRES CARR & SULLIVAN, P.C.
bclement@acs-law.com

Jeffrey L. Hunter
UNITED STATES ATTORNEY'S OFFICE
jeff.hunter@usdoj.gov

Sarah Thomas Mayhew
US DEPT OF JUSTICE TAX DIVISION, CTS-NORTHERN

Sarah.T.Mayhew@usdoj.gov